

The following constitutes the order of the Court.
Signed: December 12, 2018

_____
M. Elaine Hammond
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>Pacific Thomas Corporation,<br><br><br><br>                 Debtor. | Case No. 14-54232 MEH<br><br>Chapter 11 |
| Kyle Everett, Chapter 11 Trustee,<br>                 Plaintiff.<br>v.<br>Randall Whitney, et. al.,<br>                 Defendants. | Adv. No. 14-05114<br><br><br><br>Prior Hearing Date<br>Date:   August 20, 2018<br>Time:  1:30 p.m.<br>Ctrm:  Courtroom 3020, 280 South<br>          First Street, San Jose, CA. |

## SUPPLEMENT TO DECISION AFTER TRIAL FOLLOWING REMAND

The Ninth Circuit remanded this adversary proceeding to the bankruptcy court "to determine whether the parties' various lease agreements (the 2005 lease, the 2008 lease, the 2010 extension, and the 2012 amendment) are void under principles of California contract law."

1

Following briefing, the matter came on for hearing on August 20, 2018, and was taken under submission on August 24, 2018.

On appeal, the Trustee identified two legal theories supporting his position that the lease agreements are void: (1) Pacific Thomas Corporation ("PTC") and Pacific Trading Ventures ("PTV")[1] mutually rescinded the lease and (2) the lease agreement was a sham contract, and thus void from the beginning. In briefing on remand, the Trustee also asserts that the lease agreements were illegal contracts. Each of these arguments is addressed below.

The history of operations between PTC and PTV, and their agreements, in particular the Management Agreement and Lease Agreement, is provided in the Amended Order After Trial (Dkt. # 210), and incorporated herein, in particular, pages 4-7. In summary:

- PTC and PTV entered into a Management Agreement in 2003 for PTV to manage PTC's real property and self-storage facility. PTV's responsibilities included collecting rents from tenants and maintaining records related to disbursement in connection with management of the premises. In 2011, the parties amended the Management Agreement to extend its term and increase PTV's minimum monthly fee. This amendment was subsequently ratified by PTC's board of directors. Unless specifically identified as the 2011 Extension, "Management Agreement" shall refer herein to the 2003 Management Agreement.
- In 2005, the parties signed a Lease Agreement whereby PTC leased to PTV buildings A-K and a 1,500 square foot portion of the Morse Building used in connection with the self-storage facility. In 2010, the parties agreed to a five year extension of this Lease Agreement. Then, on August 1, 2012, shortly before PTC's chapter 11 filing, PTC and PTV signed an amendment and modification to the Lease Agreement. Unless specifically identified as the 2010 Extension or 2012 Amendment, "Lease Agreement" shall refer herein to the 2005 Lease Agreement.

---

[1] PTV's arguments are also made by Jill Worsley, its owner.

Case: 14-05114    Doc# 264    Filed: 12/12/18    Entered: 12/12/18 10:39:46    Page 2 of 11

- In 2008, PTC and PTV entered into a separate lease agreement for the 1,500 square foot portion of the Morse Building used with the self-storage facility. Referred to herein as the "2008 Lease". The 2008 Lease purports to lease real property that is included within the Lease Agreement. PTV did not assert or admit evidence to support a finding that the 2008 Lease was a binding agreement between the parties.
- PTC's accounting records (the "QuickBooks") for 2005-2011 are consistent with the terms of the Management Agreement in that PTC includes the revenues and expenses of the self-storage facility in its financials. PTC's profit and loss statements for the same period are consistent with the QuickBooks.
- PTC's tax returns for 2005-2011 include the revenues and expenses of operations related to the self-storage facility.
- PTV regularly invoiced PTC under the Management Agreement for the monthly management fee related to the self-storage facility and received payment based on these invoices.[2]

Mutual Rescission:

An executory bilateral contract may be rescinded by the mutual consent of the parties. The rescission may be manifested by the parties conduct, provided that the acts and conduct relied on are positive, unequivocal, and inconsistent with the contract. A mutual intent to rescind is required, however where one party refuses to comply with the contract, and the other party acquiesces, a rescission by consent is effective. *See Pennel v. Pond Union School Dist.*, 29 Cal. App. 3d 832, 837-38 (Cal. Ct. App. 1973). Mutual rescission or abandonment is not a modification of a contract, rather the contract terminates and any unperformed promise is abrogated. *See Honda v. Reed*, 156 Cal. App. 2d 536, 539-40 (Cal. Ct. App. 1958).

---

[2] Exhibit J (PTV QuickBooks), Exhibit L (2007 invoices from PTV to PTC), and Exhibit M (2008 invoices).

PTC and PTV first entered into the Management Agreement in 2003. Pursuant to its terms, PTV managed PTC's self-storage facility. In operation, PTV received PTC's bills, then invoiced PTC for the amount due or paid directly by PTV. PTV received a monthly management fee equal to the greater of $1,500 per month or 6% of gross revenue.[3]

Two years later, PTC and PTV signed the Lease Agreement. By its terms, the Lease Agreement required significant changes be made to the operations and accounting that existed under their prior Management Agreement, entered into in 2003. In contrast to the existing agreement, PTC leased to PTV buildings A-K and a portion of the Morse building used for the self-storage facility for $2,500 per month, plus the greater of $22,500 or 40% of the property net operating income proceeds. Then, PTC and PTV signed the 2008 Lease solely for a portion of the Morse building.

Despite this change in the operational and financial terms between the entities, neither companies' QuickBooks reflect financial operations consistent with the Lease Agreement. From 2005 through 2011, each companies' QuickBooks – their recorded financial transactions – evidence continued compliance with the Management Agreement. Linda Manning, an independent bookkeeper that worked for PTV two days a week for over 10 years, testified that during this time period she regularly prepared invoices to PTC for the percentage fee due under the Management Agreement, as well as repairs or supplies directly provided to PTV by PTC.[4] PTC's tax returns for 2005 to 2011, filed under penalty of perjury, are consistent with the QuickBooks data,[5] thereby establishing that the mutual rescission of the Lease Agreement occurred as early as 2005, and again after signing of the 2008 Lease.

PTC's subsequent corporate records further support mutual rescission. On June 30, 2011, PTC's board of directors voted to ratify the 2011 Extension to the Management Agreement. The board members present, Randall Whitney and Jill Worsley, approved

---

[3] The 2011 Amended Management Agreement increased PTV's monthly fee to the greater of $2,000 or 6% of gross revenue.
[4] Trial transcript (Dkt. # 190), p. 210-215
[5] Exhibit 3

4

ratification of the Management Agreement.[6]  And again, there is no record in PTC's corporate minutes of the directors seeking board approval of the 2010 Extension to the Lease Agreement.  Through the act to ratify the 2011 Extension and failure to consider the 2010 Extension, PTC's board members—who are also the signatories to the Lease Agreement on behalf of PTC and PTV—positively and unequivocally rescinded the Lease Agreement by ratifying a conflicting agreement.  *See Honda v. Reed*, 156 Cal. App. 2d at 539 ("Abandonment of a contract may be implied from the acts of the parties in negotiating for a new and different contract concerning the same property or subject matter.").[7]  Upon rescission, the 2010 Extension to the Lease Agreement was terminated.

Even more, PTC and PTV each made representations to third parties throughout this period that no lease existed between them.  In a promissory note dated July 27, 2007, PTC represented to its primary secured lender that as of July 16, 2007, PTC did not have any tenants.[8]  In documents prepared to obtain financing in 2010, and updated as of March 31, 2011, PTC provided detailed information about leases it hoped to sign with potential tenants, and the financial impact of these leases, yet, a lease with PTV is never mentioned.[9]  Finally, the City of Oakland Business Tax Certificate posted in PTC's office identified the safe-storage facility as PTC's business.[10]

PTV's representation is particularly on point.  In a document faxed and emailed on November 8, 2005 – 11 months after the Lease Agreement was signed – PTV's owner stated that she accepted a management agreement with PTC to manage its storage facility, for which

---

[6] Exhibit 6
[7] Though some might argue that the Lease Agreement was a rescission of the Management Agreement, the court finds this to be without merit based on the overwhelming evidence that the parties continued to comply with the Management Agreement from 2005 through PTC's bankruptcy filing.
[8] Exhibit 22, p. 3 "Approval of Leases".
[9] Exhibit 8
[10] Exhibit 5

she received a monthly management fee.[11] This evidence further supports a finding that the parties never intended to comply with the Lease Agreement.

Aside from the 2010 Extension not approved by the board, PTV admitted no evidence to support a finding that PTC and PTV performed according to the Lease Agreement prior to 2012.

Instead, PTV asserts that PTC's receipt of funds following the 2012 amendment prohibits rescission, relying on *Neet v. Holmes*, 25 Cal. 2d 447 (1944). In *Neet*, the California Supreme Court stated: "The general rule . . . is that the offer to restore what has been received under the contract is a condition precedent to maintaining an action founded on the assumption that rescission has been accomplished by the act of the party." PTV relies upon its position that the parties complied with the Lease Agreement from August 2012 through September 2013. The QuickBooks for each company indicate performance during this period. But, the books and records provided to the Trustee by PTV in May 2013 had different information. Because of the changing balances, the Trustee performed an audit trail of PTV's QuickBooks and determined that entries shifting revenues and assets from PTC to PTV were first entered in August 2013.[12] Thus, there is also no credible evidence of compliance with the Lease Agreement during this period.

Finally, PTV argues that the Trustee received funds pursuant to the Lease Agreement during the case. However, the testimony provided establishes that the Trustee accepted funds for the benefit of PTC, without agreement regarding the source or amount of obligation.[13]

Review of the legal assertions built into PTV's arguments further undermines the probative value of its position. First, rescission of a contract terminates it entirely. *See Honda v. Reed*, 156 Cal. App. 2d at 539-40. As the parties mutually consented to abandonment of the Lease Agreement in 2005, it terminated and could not be later extended

---

[11] Exhibit 9
[12] Trial transcript (Dkt # 190), p. 53-54.
[13] Trial transcript (Dkt.# 190), p. 128.

6

or amended. Second, even if the 2012 Amendment were to be valid, or the initiation of a new agreement, PTC could not enter into it based solely on Randall Whitney's signature as chief operating officer. Eight months prior Roger Huddlestone was appointed as receiver for PTC by the Alameda County Superior Court. This "Receivership Order" appoints Huddlestone to take possession of PTC's real property and personal property, including "all accounts, general intangibles, instruments, rents, monies, payments, and **all other rights, arising out of a** sale, **lease,** consignment or other disposition of any of the property described in this Collateral section."[14] The receiver may "without court approval enter into lease for a term not exceeding one year, . . . and set and modify the amounts and terms of leases."[15]

"It has been long recognized that a receiver is an agent and officer of the appointing court." *City of Santa Monica v. Gonzalez,* 43 Cal.4th 905, 930 (2008), *citing inter alia, Lesser & Son v. Seymour,* 35 Cal.2d 494, 499, 218 P.2d 536 (1950). "Property in receivership remains under the court's control and continuous supervision, and the importance of such supervision cannot be overstated." *Id.* at 930. California law recognizes that property subject to a court-appointed receivership is in the custody of the court itself. *See Pacific Railway Co. v. Wade,* 91 Cal. 449, 455 (1891). "Generally, the functions and powers of a receiver are controlled by statute, by order of appointment, and by the court's subsequent orders." *City of Santa Monica*, 43 Cal. 4th at 930.

The Receivership Order identified the real property at issue as property of the receivership, along with certain personal property. The receiver was required to take possession of and manage the property, and as to leases, was authorized to modify the amounts and terms of leases. The Receiver did not approve the 2012 lease amendment. Nor did the court supervising the receivership. As such, no entity with authority to bind PTC approved or authorized the 2012 Amendment.

---

[14] Receivership Order (Dkt # 259-1)
[15] Receivership Order (Dkt. # 259-1), paragraph 11

7

On remand, the court finds substantial evidence that PTV and PTC mutually rescinded the Lease Agreement and 2008 Lease, contemporaneous with their entering into such agreements, based upon their conduct reflected in financial and corporate records, and through representations to third parties. The evidence relied upon consists of the parties' financial records, corporate minutes, and statements made to third-parties while seeking to obtain financing. As such, the court finds the evidence to be reasonable in nature, credible, and of solid value.

Sham Contract and Illegal Contract:

The Trustee's remaining arguments rely on PTC's purpose and intent in entering into the Lease Agreement. The Trustee first asserts that the Lease Agreement is a sham contract, and therefore void. In order to invalidate a contract as a sham, the court must find that PTC and PTV entered into the lease agreement with an intent to deceive a third party. *See FPI Dev., Inc. v. Nakashima*, 231 Cal. App. 3d 367, 401 n. 18 (1991). A contract may not be relied upon when enforcement of the contract is against the interests of a party upon whom the pretense is perpetrated. *Id.* Alternatively, the Trustee asserts that the Lease Agreement is an illegal contract as it was entered into against public policy and "contrary to good morals." *See Bacciocco v. Transamerica Corp.*, 2 Cal. App. 2d 595, 597 (1934).

These arguments rest on the premise that PTC entered into the Lease Agreement in order to conceal rents from its secured creditors, thereby reducing its obligations to them. However, no testimony or documentary evidence was presented as to why PTC entered into the Lease Agreement. The only information on this point was provided in Whitney's opening argument. In his opening, Whitney stated that he hoped to show that the management and control of the storage operations was overseen by PTV and this morphed into the Lease Agreement in order to satisfy a new secured lender's requirements.[16]

---

[16] Trial transcript (Dkt. # 190), p. 31.

8

This information provides context for why PTC may have entered into the Lease Agreement and then failed to perform according to its terms.  However, it is of insufficient character and weight to establish that the Lease Agreement was a sham contract or illegal contract.

Arguments of Randall Whitney

Mr. Whitney filed a response to the Trustee's brief on remand.  The Trustee asserts that Whitney lacks standing as he is not a party to any of the lease agreements to be considered on remand.  Nevertheless, the court reviewed the arguments presented by Whitney.  They consist of: (1) an assertion of standing, (2) assertions that the Trustee did not properly terminate the Lease Agreement pursuant to its terms, and (3) argument that since all defendants did not stipulate to admission of the books and records proffered by the Trustee at trial they cannot be considered the "official set of books and records."  These are not the issues the Ninth Circuit remanded to this court for further review, and thus are not persuasive on the issues presented.

Conclusion:

The court finds that the Lease Agreement and 2008 Lease were each mutually rescinded by PTC and PTV shortly after their signing, as evidenced by positive, unequivocal acts of the corporate entities and their representatives.  The progeny of the Lease Agreement, the 2010 Extension was further mutually rescinded by the failure of PTC's board to ratify it, followed by the ratification of the 2011 Extension to the Management Agreement.  Finally, the 2012 Amendment to the Lease Agreement was ineffective as an amendment to a terminated contract, not approved by the required party or court, and the evidence does not support a finding that it was complied with by the parties.

In furtherance of the Ninth Circuit's directive on remand, a scheduling conference will be set on the remaining question of whether PTV's right to reimbursement under the Management Agreement affects the turnover award.

***END OF ORDER***

## COURT SERVICE LIST

**Randall Whitney**
1818 Mt. Diablo Blvd., Suite D
Walnut Creek, Ca 94596

**Mia Blackler**
Lubin Olson & Niewiadomski LLP
600 Montgomery Street, 14th Floor
San Francisco, CA 94111

**Via ECF:**

All ECF Recipients