Entered on Docket
May 28, 2019
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



The following constitutes the order of the Court.
Signed: May 28, 2019

_____
**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>Pacific Thomas Corporation,<br><br>             Debtor. | Case No. 14-54232 MEH<br>Chapter 11 |
| Kyle Everett, Chapter 11 Trustee,<br>             Plaintiff.<br>v.<br>Randall Whitney, et. al.,<br>             Defendants. | Adv. No. 14-05114<br><br>**Trial Held**<br>Date:  March 14, 2019<br>Time:  10:00 a.m.<br>Ctrm:  Courtroom 3020, 280 South<br>          First Street, San Jose, CA. |

### MEMORANDUM DECISION REGARDING TURNOVER AWARD

On March 27, 2018, the Ninth Circuit issued a memorandum vacating this court's judgment and remanding for further findings (Dkt. #234). Following entry of the Order Vacating Judgment (Dkt. #235) this court conducted a bifurcated trial on whether the parties'

lease agreements are void under principles of California law and the appropriate judgment amount. As set forth in the Supplement to Decision After Trial Following Remand (Dkt. #264), this court found that the 2005 lease agreement between Pacific Trading Ventures ("PTV") and Pacific Thomas Corporation ("Debtor") was invalid. In its remand, the Ninth Circuit instructed the court to determine whether the parties' various lease agreements (the 2005 lease, the 2008 lease, the 2010 extension, and the 2012 amendment) were void under principles of California law. Following determination of this issue, the court was required to calculate the extent to which PTV's right to reimbursement under the management agreement affects any turnover award.

An evidentiary hearing was held on March 14, 2019, to determine what amounts, if any, are owed by PTV to the Debtor's estate. The Chapter 11 Trustee ("Trustee") and PTV participated in the hearing.

It is Trustee's burden to establish the estate is entitled to a turnover. *In re Jacobson*, 676 F.3d 1193, 1200-01 (9th Cir. 2012). Trustee must establish by a preponderance of the evidence that: "(1) the property is (or was during the bankruptcy case) in the possession, custody or control of a noncustodial third party; (2) the property constitutes property of the estate; (3) the property is a the type that the trustee could use, sell or lease pursuant to section 363 . . ., and (4) the property is not of inconsequential value or benefit to the estate." 5 Collier on Bankruptcy ¶ 542.03 (16th 2019).[1]

Pursuant to the 2003 Management Agreement between PTV and Debtor ("Management Agreement"), as amended in January 2011 ("Amended Management

---

[1] In its Closing Brief, PTV argues that the applicable standard is "clear and convincing evidence" in reliance on the pre-Code case of *Maggio v. Zeita (In re Luma Camera Service, Inc.)*, 333 U.S. 56 (1948). Since enactment of the Bankruptcy Code, Supreme Court cases have adopted the preponderance of the evidence standard in bankruptcy cases. *See Grogan v. Garner*, 498 U.S. 279 (1991) (finding that preponderance of the evidence standard applies to exceptions to dischargeability of debts, including nondischargeability for fraud). In *Jacobson*, the Ninth Circuit applied a preponderance of the evidence standard without deciding whether a higher standard applied. *Jacobson*, 676 F. 3d at 1201. Accordingly, this court will apply a preponderance of evidence standard as well.

Agreement"), PTV operated Debtor's self-storage facility in Oakland and managed real property owned by Debtor at the same location (collectively, the "Premises"). PTV collected all rents and self-storage fees due from tenants and made or had control over all operations, maintenance, repairs, and capital improvements of the Premises.[2] In operation, PTV collected Debtor's income and used it directly to pay Debtor's expenses, or paid Debtor's expenses with PTV funds and reimbursed itself from Debtor's funds. The Management Agreement authorizes PTV to receive a fee of six percent (6%) of the gross revenues per months based on accrued charges or $2,000 per month, whichever is greater. Additional compensation is allowed for non-recurring repairs, capital improvements or large projects.[3] Further, "the cost of certain personnel who supervise, or otherwise participate in, the direct management of the [self-storage and related business] will be paid by [Debtor]."[4]

Trustee asserts that PTV collected rents owed to Debtor and, in addition to using them for Debtor's expenses, used these funds for purposes that did not benefit Debtor – instead benefiting PTV, Darrow Family Partners, Thomas Capital Investments, Randall Whitney and Jill Worsley. Trustee testified that if these funds had been available to Debtor, then Debtor could have used them for payment of property taxes and other obligations. Trustee seeks turnover of $376,522 which is not of inconsequential benefit to the estate.

Trustee's claim is based on entries contained in the Quickbooks created and maintained by PTV, and obtained from PTV's bookkeeper in December 2013 (the "PTV Quickbooks"). Trustee relies on the check detail and notations contained in the PTV Quickbooks, along with supporting invoices where available. Notably, much of Trustee's concern relates to the lack of backup, such as invoices or receipts, to support the expenditures. All claims relate to the period between Debtor's petition date, August 6, 2012, and December 10, 2013, following termination of the Management Agreement for cause by

---

[2] Management Agreement, Article II.
[3] Amended Management Agreement, Article VI.
[4] Management Agreement, Article V.

Trustee and entry of a preliminary injunction.

In his review of the PTV Quickbooks and any notations or other information provided therein, Trustee determined that PTV received a total of $697,786.35 during this time period. In review on remand, the funds paid out by PTV were divided into categories based on the check, invoice, and/or Quickbooks notes detail. Trustee then identified each category as those that "appeared to be legitimate estate operating expenses" and those that "do not appear to be legitimate estate operating expenditures." A summary by category was admitted into evidence, in addition to line item entries by category. In total, Trustee identified $321,234.25 in expenditures that appeared to be legitimate.[5]

The Trustee then testified as to to those categories that did not appear to be legitimate expenses of Debtor. In sum, Trustee identified $376,552.10, in disputed expenses divided into 37 categories.

Randall Whitney, Debtor's former president, and an officer of PTV presented opposing testimony. Through his testimony, Whitney asserted that a portion of the claims in 28 of the categories were for the benefit of Debtor or Debtor's estate. PTV's president, Jill Worsley, also testified about her control over expenditures. Worsley did not address the disputed expenditures by category or line item but testified that she was the primary individual responsible for PTV's management of PTC's self-storage and real property interests. Specifically, she stated that she was the only authorized signer of PTV's checks, that twice a month she and the PTV bookkeeper would review monthly expenses and the budget; and that Worsley maintained final approval over all payments. She was adamant that neither she nor the bookkeeper would authorize payment without sufficient back-up.

The PTV Quickbooks established that in accordance with the Management Agreement, PTV collected income generated by Debtor's self-storage facility and real properties and used these receivables to pay the operating expenses of Debtor. However,

---

[5] Trial exhibit 24-0002 identified $367,637.25 as appearing legitimate, in testimony Trustee reduced this by $46,403 based on Outside Labor (Cash), discussed infra.

PTV also used Debtor's income to fund expenses of PTV and additional entities affiliated with Whitney or Worsley, such as Darrow Family Partner and Thomas Capital Investments.

Consistent with the parties' presentation of evidence, the amounts in dispute are reviewed by category as follows:

Rents Received but Not Deposited:

Trustee testified that PTV's Quickbooks reflected $37,000 in cash received on behalf of Debtor that was never deposited into a bank account. Instead, the funds were applied towards cash payments. Of these funds, Trustee identified $6,000 that he testified do not appear to be legitimate expenses of the Debtor, with the remainder allocated to "Outside Labor Cash" (discussed in the following section). PTV did not address these funds at trial. In its closing brief, PTV argues this assertion should be disregarded because the only evidence to support it is oral testimony. Witness testimony is a form of evidence, subject to determinations of credibility by the trier of fact. *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1142 (9th Cir. 1999); *Kalvar Corp. v. Xidex Corp.*, 384 F. Supp. 1126, 1132 (N.D. Cal. 1973), *aff'd,* 556 F.2d 966 (9th Cir. 1977). Both Trustee and PTV rely extensively on oral testimony, including opinion testimony. Here, as in other areas below, the court will consider such evidence in determining whether Trustee establishes PTV owes funds to Debtor's estate or PTV adequately rebuts the claim asserted by Trustee.

For the purposes of this section, I find that the Trustee presented evidence based upon the PTV Quickbooks that significant sums of money were paid by PTV in cash to third parties. PTV does not dispute that at least $46,000 was paid in cash to outside labor during the 16 month period at issue. As such, I find Trustee's testimony credible that PTV received and paid cash in its standard operations without running these funds through its bank accounts. Thus, of the additional rents received but not deposited, $6,000 was not paid for

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

legitimate operational expenses of Debtors. The remainder of $31,000 is addressed in the following section.

Outside Labor (Cash):

Trustee asserts that a total of $77,403 in cash payments to outside labor without any supporting invoices or 1099s is excessive for a self-storage business of this size. Considering Debtor's maintenance, repair, and landscaping needs the Trustee admits that some portion of these expenses may be legitimate business expenses of Debtor. Neither Whitney nor Worsley addressed the cash payments to outside labor in their testimony. The Management Agreement authorizes PTV to hire, through Debtor, "maintenance personnel and other individuals rendering services or performing activities on the Premises in connection with its operation or maintenance."[6] Of the various entities involving Whitney or Worsley (e.g. PTV, Debtor, Darrow Family Partners, Thomas Capital Investments), Debtor's operations required the greatest amount of maintenance, repair, and other labor. As such, the court finds that 80% of the outside labor, $61,922.40, will be recognized as a legitimate expense of Debtor paid by PTV.

Accountant & Taxes:

Trustee asserts that $7,432 paid to Timothy Brophy is not an expense of Debtor. Mr. Brophy is a CPA that prepared the taxes of PTV for approximately 10 years, and of Debtor for 6 to 7 years. He was a witness at the original trial in this adversary proceeding on April 29, 2014.

For Mr. Brophy to perform and be compensated for services during Debtor's bankruptcy, the court must approve his retention following review of an employment

---

[6] Management Agreement, Article V.

application and subsequent approval of his compensation. *See* 11 U.S.C. §§ 327, 330.[7] Brophy was never employed in this case. In addition, Trustee testified that based upon the payment information the payments to Brophy were on account of a pre-petition balance. If Debtor had sought to retain Brophy, to satisfy the "disinterested" requirement for employment Brophy would have had to waive any prepetition amount due to him. Payment to Brophy during the case without court approval is neither authorized by the Code nor a benefit to Debtor. This expense is not a legitimate expense of Debtor paid by PTV.

Accounting:

PTV paid $35,093.90 to L&S Enterprises, for the services of Linda Manning as its bookkeeper. Trustee asserts that this is not a legitimate expense of Debtor because all of Manning's time was coded to Walnut Creek (the PTV location) and the payments to L&S Enterprises are never split between PTV and Debtor.

Manning was a witness at the initial trial. At trial she identified herself as the bookkeeper for PTV. She did not identify herself as the bookkeeper for Debtor. The Management Agreement does not provide for Debtor to pay PTV's operational expenses and Manning is neither property-level personnel for the Premises nor an individual that participated in direct management of the Debtor. As such, payment to L&S Enterprises is the obligation of PTV.

Appraisal Fees:

PTV paid $9,400 for appraisal fees incurred by Whitney in connection with attempts to refinance the loans held by secured creditors of Debtor. Like accountants, Bankruptcy Code § 327(a) identifies appraisers as professional persons whose employment and

---

[7] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§101–1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001–9037 (referred to herein as the "Bankruptcy Code").

compensation are required to be approved by the court.  Debtor never sought to employ these appraisers, and so, the fees were not a legitimate expense of Debtor

Cleaning Service:

PTV paid $2,460 to Magic Touch Cleaning Service.  Trustee asserts this expense was for the benefit of PTV and not the Debtor.  Whitney testified that Magic Touch was the cleaning service for the Walnut Creek office, which is PTV's business location.  This expenditure was not a legitimate expense of Debtor.

Dental Insurance:

Trustee asserts that $2,432.01 paid for Whitney's dental insurance was not an expense of Debtor as Whitney was not an employee of the Debtor.  As discussed further below, Whitney testified that he provided direct, on-site supervision during this period, and took draws of $1,000 per month as compensation.  This is consistent with the Management Agreement.  Provision of dental insurance as an employment benefit is a form of compensation.  As such, $2,432.01 is a legitimate expense of Debtor.

Dues & Subscriptions:

Trustee objects to expenditures of $391.50 categorized as dues and subscriptions. Whitney testified that a portion of these expenses, $286.50 paid to Count Me In, LLC, was for tracking employees in and out of the self-storage facility.  Debtor received the benefit for these services and $286.50 is a legitimate expense of Debtor.

Entertainment:

Trustee objects to $282.55 paid to the Pacific Racing Association for a holiday party. Notations in the PTV Quickbooks identify it as the "WC Xmas Party."  "WC" appears to

reference Walnut Creek, the business location of PTV. Whitney testified that he had no information on this expense. Thus, all evidence indicates there was no benefit to Debtor from this payment.

Gas:

Trustee recognized $652.31 in gas expenses associated with Budget Truck Rental as a legitimate expense of Debtor. Trustee asserts that $2,667.20 paid directly to four gas companies is not an expense of Debtor as there is no indication that it relates to the Budget Truck Rental operation. Whitney testified that these payments were a combination of gas for the truck rental and employee reimbursements for driving between PTV's offices in Walnut Creek and Debtor's facility in Oakland. This testimony is not convincing as Whitney and Worsley appear to be the only individuals that regularly drove between the two locations, and as they had multiple interests, there is no indication that their gas is entirely the responsibility of Debtor. Further, as the PTV Quickbooks had a separate account for Budget Truck Rental, the failure to allocate these expenses to that account are evidence that they are not for that purpose. These payments are not legitimate expenses of Debtor.

Jill Worsley:

Trustee objects to $65,174.74 paid to Worsley. The PTV Quickbooks notations indicate that of this amount $51,000 was for monthly draws of approximately $3,000 per month to Worsley. Article V of the Management Agreement provides for payment by Debtor of individuals who supervise or otherwise participate in direct management of the Premises. Worsley testified that she supervised management of the Premises. Also, in this category, Whitney identified reimbursements of $1,861.35 for outside labor as for the benefit of Debtor. Accordingly, $52,861.35 is a legitimate expense of Debtor.

Legal:

Trustee objects to $30,152 categorized as legal. The expenditures are to multiple entities. A line-item review indicates that the following are legitimate expenses of Debtor: $1,039 to Debtor's initial bankruptcy counsel for the chapter 11 filing fee, $201 to CourtCall for monitoring of bankruptcy court hearings, and $220 to Key Service Corporation, the entity identified by Whitney as providing employee background checks. The remainder of payees primarily consist of payments to attorneys for PTV (e.g. David Sternberg, Paul McCarthy); legal entities not retained or authorized to receive compensation pursuant to Bankruptcy Code §§ 327 and 330 (e.g., Bicycle Engineering, Capital Restructure Group); or county recorder or superior court filings not for Debtor's benefit. As such, $1,262 is a legitimate expense of Debtor.

Marketing/Promotion:

Trustee asserted that there is no evidence to support that $18,733.48 in expenditures for marketing and promotion are for the Debtor. PTV asserts that the majority of these expenses related to attracting customers to the Premises and seeks to have $17,499.18 recognized as expenses of Debtor. Whitney credibly identified in his testimony Constant Contact as a service for communications to existing and future customers, Loopnet as an online market for commercial space, Performance Self-Storage as a group that focused on attracting new self-storage customers through phone marketing, SpareFoot as a marketing website that aggregates groups of people to self-storage in their neighborhood, and Web.com as a website hosting group. Whitney also testified that Leslie Whitney, his wife, was reimbursed or paid a flat fee for marketing services. This testimony is consistent with the PTV Quickbooks notation of SafeStorage associated with the checks to her.

Whitney's testimony on other points was not credible. Specifically, that the Asian American Bar Association was an Oakland related industry group bringing people to Debtor's

location and that the Bay Area Writing Project was a marketing consultant that helped organize Debtor's marketing efforts. Further, there are several smaller checks where no attempt was made to assert that they were an expense of Debtor. In the end, $12,826.90 is a legitimate expense of Debtor.

Office Supplies:

Trustee recognized $16,787.31 in office supplies coded in the PTV Quickbooks to either Oakland or Safe Storage. He asserts that $4,292.34 coded to Walnut Creek are obligations of PTV, not the Debtor. Whitney testified that East Bay Blue Print and Supply held all the architectural and construction plans. During this period, Trustee was pursuing a sale of Debtor's real property and Debtor provided plans and information helpful to these efforts. Payments of $185.64 to East Bay Blue Print are allocated to Debtor. Whitney also testified that FedEx Office was used for most materials and paperwork. However, this testimony is inconsistent with the equivalent expenditures to Office Depot and Quill Corporation for office supplies allocated in the PTV Quickbooks to Debtor. Payments totaling $185.64 are legitimate expense of Debtor.

Other Expenses:

Trustee asserts that a payment of $100 to Frank Spangler is an expense of PTV rather than Debtor based on its categorization as a Walnut Creek expense in the PTV Quickbooks. Neither Whitney nor Worsley addressed this in their testimony. The evidence is that this was a payment on behalf of PTV rather than Debtor.

Parking:

Trustee asserted that $490.34 in expenditures for parking primarily related to court hearings and were not for the benefit of Debtor. Whitney testified that this parking provided a

mixed benefit to PTV and Debtor as the parking lots identified are centrally located and used for visits to the court, the planning office, and other nearby businesses. As such, these parking expenses appear to have benefited both PTV and Debtor. A legitimate expense of $245.17 for Debtor is recognized.

Postage & Delivery:

Trustee recognized $6,596.04 in payments to Neopost as legitimate postage and delivery expenses of Debtor. These payments were each coded to Debtor in the PTV Quickbooks. Trustee asserts that the $1,150.93 paid to the USPS is an expense of Debtor. Whitney guesstimated that these expenses should be split between Debtor and PTV. However, a review of the PTV Quickbooks detail indicates that at least one of the payments relates to Thomas Capital Investments. Thus, these payments were made for multiple entities. Removing the payment for the benefit of Thomas Capital Investments, and dividing the remaining expenses between the four entities, $266.82 is a legitimate expense of Debtor.

Property Tax:

Trustee asserted that three payments totaling $886.39 to the tax collectors for Alameda and Contra Costa County were not Debtor's expenses because Debtor's property taxes were significantly larger. Debtor is located in Alameda County and PTV is located in Contra Costa County. There is no indication in the record that PTV had assets or a basis to pay taxes in Alameda County, as such Trustee's position that the Alameda County taxes must be PTV's is not compelling. An expense of $870.08 is recognized as a legitimate expense of Debtor.

Randall Whitney:

Trustee asserts that $91,694 paid to Whitney during this period was not for the benefit of, or a legitimate expenditure of, Debtor. Whitney testified that after Debtor's bankruptcy

filing, instead of serving in his prior role as president of the Debtor, he was the appointed responsible party.[8] He also stated that he worked 6 to 7 days per week at the Oakland property and took draws of $1,000 as his compensation. Review of the challenged expenditures indicates that Whitney received $1,000 per month between August 2012 and August 2013 for a total of $13,000 in compensation.[9] Again, Article V of the Management Agreement provides for Debtor to pay personnel who participate in direct management of the Premises. These draws are thus legitimate. In addition, the memo line on some reimbursements clearly identify a business purpose to the expense reimbursement. These expenditures reimbursed to Whitney total $2,745.

Whitney also identified two payments he received as reimbursement for payments to secured creditors: (a) $17,000 to Whitney, memo notation "Wire for FCI Pmt" and (b) $8,166.67 to Whitney, memo notation "Wire for Bowers Pmt."[10] These payments were made to Whitney within a month of the petition date, while Debtor remained a debtor-in-possession ("DIP"). It is unclear whether the payments to the secured creditor were made before or after the petition date. If the payments were made to the secured creditor prepetition, then any claim for reimbursement Whitney may have is an unsecured prepetition claim not entitled to a 100% reimbursement post-petition. If the payments were made to the secured creditor postpetition, then reimbursement of Whitney is counter to the terms of the stipulation for use

---

[8] Northern District of California Bankruptcy Local Rule 4002-1 provides that a debtor-in-possession that is not an individual shall file an application and obtain an order appointing a natural person to be responsible for the duties and obligations of the debtor-in-possession, as set forth in FRBP 4002.

[9] How these funds were paid varied. Most months a $1,000 payment was provided but a few times the payment was split into two payments, and the May through August 2013 payments appear to have been made via single payment in August 2013.

[10] These appear to be for payments to the same entity, Private Capital Investments, f/k/a Bowers Group ("PCI").

[11] Post-petition Debtor entered into a stipulation for use of cash collateral with PCI requiring monthly payments of $8,166.67 from cash collateral. (Case No. 14-54232, Dkt. # 51). The subsequent order approving use of cash collateral stated: "Debtor is authorized to use cash collateral . . . provided that cash collateral is to be paid to the extent there are rent receipts to make the payment." (Dkt. # 123)

of cash collateral entered into between Debtor and PCI, and the requirements of the order approving the stipulation which only authorized payment to this junior secured creditor from rent receipts.[11] Nor did Debtor obtain approval for DIP financing from Whitney. *See* § 364. As such, these payments to Whitney are not legitimate expenditures of Debtor.

The remainder of this category primarily consists of reimbursements to Whitney. From the court's review of the PTV Quickbooks, it is clear that Whitney regularly used the Debtor's funds as if they were his personal assets. On numerous occasions Whitney withdrew Debtor funds from an ATM. The impression is that every time Whitney spent money he submitted it for reimbursement, for example McDonalds (lines #845, 862, 943), Jack in the Box (#839), a yogurt shop (#795), and Google Play (#997-999). Numerous travel expenses, especially to or in Hawaii (#628) were reimbursed, despite the fact Debtor has no property or operations in Hawaii.[12] Whitney also sought reimbursement several times for short-term workspace outside Debtor's business location (#725, 731, 732).

In sum, a total of $15,745 is determined to be a legitimate expense of Debtor.

Recruiting Expenses:

Trustee testified that a recruiting expense classified to "Walnut Creek" was an expense of PTV. No evidence to the contrary was provided. This is not a legitimate expense of Debtor.

---

[11] Post-petition Debtor entered into a stipulation for use of cash collateral with PCI requiring monthly payments of $8,166.67 from cash collateral. (Case No. 14-54232, Dkt. # 51). The subsequent order approving use of cash collateral stated: "Debtor is authorized to use cash collateral . . . provided that cash collateral is to be paid to the extent there are rent receipts to make the payment." (Dkt. # 123)

[12] Non-debtor entities affiliated with Whitney or Worsley have real property in Hawaii.

Refinance:

Trustee was appointed in January 2013. In February and March 2013, PTV sent three wires totaling $11,500 to an entity Thorofare Capital, as a part of efforts by Whitney to obtain a refinance of Debtor's secured obligations. These payments were made to professionals without court approval and were not authorized by Trustee, who was then responsible for Debtor's estate. Further, the terms of the Management Agreement are limited to management of the Premises, including the self-storage operations. This type of financial restructuring is outside the scope of PTV's property management obligations. These payments are not a legitimate expense of Debtor.

Rent:

Trustee asserts that rent paid for PTV's headquarters at 1818 Mt. Diablo Boulevard in Walnut Creek is PTV's obligation. Whitney testified that Debtor's development office was located downstairs and the rent should be shared. Whitney's testimony is not compelling for two reasons. First, if Debtor used or had a contractual obligation for this location, this information would be known to Trustee. Second, PTV was the property manager for the self-storage facility at Debtor's Oakland property. The Management Agreement addresses PTV's obligations regarding these property-specific operations and do not include any development operations of Debtor. Rent for PTV's office is the responsibility of PTV.

Rental (Vehicle Rental):

Trustee recognized $15,539.33 as a legitimate business expense of Debtor in connection with the Budget Truck rental available at Debtor's Premises. He asserts that $7,079.29 in expenses paid to Avis Car Rental are not legitimate. Whitney asserts that these expenses relate to car rentals associated with the truck rental location. Whitney's testimony is not consistent with how each of these expenses are treated in the PTV Quickbooks. Payments

to Budget Truck Rental include a memo notation with the dealer number and are coded to "Budget Truck Rental Revenue." In comparison, payments to Avis Car Rental do not include any dealer information and are coded to "Rental." As such, these are direct payments for car rentals not associated with Debtor's operations.

Repair & Maintenance:

Trustee recognized $11,531.56 as legitimate repair and maintenance costs for Debtor's self-storage business and challenges three invoices totaling $3,443.90 that were coded as related to Walnut Creek instead of Debtor's Oakland operations. Notably, one invoice for $1,950 was for July 2012, and is a prepetition debt. Whitney stated that these invoices "looked like" they were for services rendered to Debtor. But as Whitney was not responsible for reviewing invoices or overseeing repairs, his testimony is not compelling. These payments are not the responsibility of Debtor.

Security:

Trustee asserts that $1,050 for Pacific Rim Security was coded to Walnut Creek and there is no information to support it being an expense of Debtor. Whitney testified Pacific Rim provided the security service at the Oakland property. As Trustee has not identified legitimate security expenses for a different provider in Oakland, this is a legitimate expense of $1,050 of Debtor.

Telephone & Internet:

Trustee recognized $5,344.60 as a legitimate expense of Debtor for telephone and internet. He challenges $15,722.60 on the basis that it was coded as an expense for Walnut Creek and there is no additional information. In review of the information provided in the PTV Quickbooks, the additional details for most line items reference Walnut Creek, but

several categories do not. In particular, payments to AT&T Mobility and Verizon Wireless are not associated with Walnut Creek. Whitney testified that a portion of these charges were for data and cell phone service provided to on-site employees. Based upon this information a total of $5,223.57 is allowed as a legitimate expense of Debtor.

Travel:

Trustee asserts that $415.90 paid in July 2013 to Delta and Southwest Airlines were not legitimate expenses of Debtor. Trustee noted that there was no travel involved in Debtor's bankruptcy case, thus, these expenses were not required. Whitney testified that the charges were for travel to a self-storage industry conference although the individual who participated in the conference was not identified. While participation in such a conference may have benefited PTV's professionals, participation in such a conference falls outside of its responsibilities under the Management Agreement. As such, this is not a legitimate expense of Debtor.

Pre-Petition Balances Paid Post-Petition:

PTV paid $4,748.70 on pre-petition unsecured claims against Debtor. Debtor never sought authorization for payment of these claims in full prior to confirmation of a plan. Unsecured creditors are not anticipated to receive a 100% distribution on their claims. This is an expense that Debtor was neither required nor authorized to pay in the ordinary course, thus there was no benefit to Debtor of this payment by PTV.

Summary of Adjustments

Applying these adjustments, Trustee established a claim for $224,608 against PTV for payments made by PTV from Debtor's funds that were either not legitimate operating expenses of Debtor or not authorized by the Bankruptcy Code or court, and thus did not

benefit Debtor. Following entry of judgment, PTV is authorized to offset its allowed management fee of $109,225 against the Judgment, in accordance with Bankruptcy Code § 553.

Supplemental Requests

At the end of trial, the court authorized closing briefs. If PTV chose to assert a claim for affirmative relief in its closing brief, then Trustee was permitted to respond. PTV asserted a judgment should be entered in its favor, and Trustee then filed a supplemental closing brief.

In addition to these permitted briefs, PTV filed a supplemental trial brief (Dkt# 313), stating that Trustee turned over an inventory listing with photos of all the evidence obtained from PTV and currently in Trustee's possession. PTV requested the turnover of all the items listed in the inventory to PTV and that the court strike Trustee's argument that PTV should be estopped from presenting evidence because PTV did not turn over its books and records. This supplemental brief was not authorized. Further, a supplemental brief is not the proper method to obtain affirmative recovery on an issue not raised at trial; and as is evidenced through this decision, the court considered the evidence presented by PTV. As such, this request will not be considered.

Following a substitution of counsel for PTV, Jill Worsley (PTV's president) filed a second unauthorized brief (Dkt# 316). Pursuant to Northern District of California Bankruptcy Local Rule 9010-1, and consistent with California law, an attorney must represent a corporate entity. As Worsley is not an attorney, she is not permitted to file such a brief on behalf of PTV. Therefore, any arguments raised in her brief were not considered.

Conclusion

A judgment consistent with the decision entered at Docket #264 and this decision is entered contemporaneously herewith.

**END OF ORDER**

# COURT SERVICE LIST

**Randall Whitney**
P.O. Box 4186
Walnut Creek, CA 94596

**Mia Blackler**
Lubin Olson & Niewiadomski LLP
600 Montgomery Street, 14th
San Francisco, CA 94111

**C. Alex Naegele**
19925 Stevens Creek Boulevard, Suite 100
Cupertino, CA 95014

ECF Participants